**Nos. 22-14116-JJ & 23-10776-JJ**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

### ANTHONY BERNARD CARTER,
*Defendant/Appellant.*

———————

**On Appeal from the United States District Court
for the Southern District of Florida**

———————

**INITIAL BRIEF OF APPELLANT
ANTHONY BERNARD CARTER**

———————

**HECTOR A. DOPICO
Interim Federal Public Defender
MICHAEL CARUSO
Assistant Federal Public Defender
Attorney for Appellant
150 West Flagler Street, Suite 1700
Miami, Florida 33130
Telephone No. (305) 530-7000**

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### United States v. Anthony Bernard Carter
### Case Nos. 22-14116-JJ & 23-10776-JJ

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Becerra, Hon. Jacqueline, United States District Court Judge

Carter, Anthony Bernard, Appellant

Caruso, Michael, Assistant Federal Public Defender

Dopico, Hector A., Interim Federal Public Defender

Gayles, Hon. Darrin P., United States District Judge

Gonzalez, Juan Antonio, Former Interim United States Attorney

Goodman, Adam Keith, Attorney

Klco, Sara Michele, Assistant United States Attorney

Lapointe, Markenzy, United States Attorney

Lopez, Alejandra Lizette, Assistant United States Attorney

Lopez, Bernardo, Assistant Federal Public Defender

Matzkin, Daniel, Assistant United States Attorney

Monk, Lacee Elizabeth, Assistant United States Attorney

Obenauf, Jessica Kahn, Assistant United States Attorney

O'Sullivan, Hon. John J., United States Magistrate Judge

Reid, Hon. Lisette M., United States Magistrate Judge

Rubio, Lisa Tobin, Assistant United States Attorney

United States of America, Appellant/Plaintiff

Fallon Zirpoli, Attorney

/s/ Michael Caruso
Michael Caruso

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Carter respectfully submits that oral argument is necessary because this appeal presents an important *Crawford* issue—whether the trial court erred by admitting a detained suspect's statements to investigating officers that accused Mr. Carter of committing a crime notwithstanding his inability to confront the missing declarant at trial.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. ii

TABLE OF CITATIONS ........................................................... v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ........................................................................ 1

STATEMENT OF THE ISSUES ............................................... 2

STATEMENT OF THE CASE ................................................. 3

    Course of Proceedings and Disposition in the District Court ........ 3

    Statement of Facts ............................................................ 4

    Standards of Review ......................................................... 22

SUMMARY OF THE ARGUMENTS .......................................... 23

ARGUMENTS AND CITATIONS OF AUTHORITY ............................. 26

I.    The district court violated Anthony's Sixth Amendment right to confrontation by admitting Amber's testimonial statements made to police investigators following her detention. In the alternative, the district court erred by admitting her out-of-court statements as excited utterances ........................................ 26

A.    The Confrontation Clause bars the use of "testimonial" statements which include witness statements made to investigating police officers—like the statements made by Amber to the investigating officers who detained her after the sting operation. ....................................................27

B.    An objective evaluation of the circumstances demonstrates that Amber's statements were testimonial because the primary purpose of her statements was to inform the investigating police officers that Anthony forced her to engage in the sex work for which she had been detained. ......................................................29

C.    The government never asserted, and the facts did not demonstrate, that the primary purpose of Amber's statements was to enable police assistance to meet an ongoing emergency ...............................................................34

D.    The government failed to prove that Amber was unavailable. ...........................................................36

E.    The government cannot show beyond a reasonable doubt that the district court's error was harmless. .......................38

F.    In the alternative, the district court erred by admitting Amber's out-of-court statements as excited utterances. ...... 43

II.   The district court constructively amended Count 2 of the superseding indictment by adopting the government's proposed jury instruction that permitted the jury to find Anthony guilty if he intended to transport A.V. for the purpose of engaging in "debauchery" thereby broadening the potential bases for conviction........................................................ 46

III.  The district court also constructively amended Count 4 of the superseding indictment by instructing the jury they could find Anthony guilty of a crime not charged by the grand jury ............ 58

IV.   The government failed to present sufficient evidence for Counts 2 and 4 that Anthony intended to transport A.V. and Amber for a proscribed purpose ..................................................... 63

CONCLUSION ......................................................................... 66

CERTIFICATE OF COMPLIANCE........................................................ 67

CERTIFICATE OF SERVICE.............................................................. 68

iv

# TABLE OF CITATIONS

## Cases

*Carrizosa v. Chiquita Brands Int'l, Inc.,*

    47 F.4th 1278 (11th Cir. 2022) ............................................................ 43

*Chapman v. California,*

    386 U.S. 18 (1967) .................................................................... 22, 38

*Cleveland v. United States,*

    329 U.S. 14 (1946) ............................................................................. 51

*Crawford v. Washington,*

    541 U.S. 36 (2004) ..................................... 3, 18, 22, 27-31 34, 36, 37, 40

*Davis v. Washington,*

    547 U.S. 813 (2006) ..................................... 27, 29, 33, 35, 52

*Delaware v. Van Arsdall,*

    475 U.S. 673 (1986) ............................................................................ 39

*Forest v. United States,*

    363 F.2d 348 (5th Cir.1966) ............................................................... 64

*Hattaway v. United States,*

    399 F.2d 431 (5th Cir. 1968) ............................................. 19, 20, 47, 48

\*_Michigan v. Bryant_,

    562 U.S. 344 (2011) ........................................................................ 30, 35

_Miller v. Keating_,

    754 F.2d 507 (3d Cir.1985) ................................................................ 44

\*_Mortensen v. United States_,

    322 U.S. 369 (1944) ............................................................................ 63

_Ohio v. Roberts_,

    448 U.S. 56 (1980) .............................................................................. 37

_Reamer v. United States_,

    318 F.2d 43 (8th Cir.1963) ................................................................ 64

\*_Stirone v. United States_,

    361 U.S. 212 (1960) ............................................................................ 50

_United States v. Alarcon-Simi_,

    300 F.3d 1172 (9th Cir. 2002) .......................................................... 45

_United States v. Alvarado-Valdez_,

    521 F.3d 337 (5th Cir. 2008) ............................................................ 42

\*_United States v. Arbolaez_,

    450 F.3d 1283 (11th Cir. 2006) .................................................... 28, 29

*United States v. Collins*,

  350 F.3d 773 (8th Cir. 2003)..................................................53

*United States v. Cooper*,

  926 F.3d 718 (11th Cir. 2019).......................................31, 59

*United States v. Curbelo*,

  726 F.3d 1260 (11th Cir. 2013).......................................30, 31

*United States v. Davila-Nieves*,

  670 F.3d 1 (1st Cir. 2012) ....................................................60

*United States v. Davis*,

  854 F.3d 601 (9th Cir. 2017)..................................................52

*United States v. Dennis*,

  237 F.3d 1295 (11th Cir. 2001)............................................50

*United States v. Dipentino*,

  242 F.3d 1090 (9th Cir. 2001)..............................................52

*United States v. Fazal-Ur-Raheman-Fazal*,

  355 F.3d 40 (1st Cir. 2004) ..................................................61

*United States v. Gray*,

  94 F.4th 1267 (11th Cir. 2024) ............................................52

*United States v. Gutierrez,*

745 F.3d 463 (11th Cir. 2014) ................................................................22

*United States v. Hano,*

922 F.3d 1272 (11th Cir. 2019) .............................................................33

*United States v. Hinton,*

423 F.3d 355 (3d Cir. 2005) ..................................................................30

*United States v. Hunerlach,*

197 F.3d 1059 (11th Cir.1999) ..............................................................22

*United States v. Irizarry-Sisco,*

87 F.4th 38 (1st Cir. 2023) ....................................................................43

*United States v. Jiminez,*

564 F.3d 1280 (11th Cir. 2009) .............................................................23

*United States v. Keller,*

916 F.2d 628 (11th Cir. 1990) ...............................................................49

*United States v. Kelly,*

2014 WL 6676593 (E.D. Pa. Nov. 21, 2014) ........................................44

*United States v. Kent,*

93 F.4th 1213 (11th Cir. 2024) .............................................................22

\*United States v. Kizzee,

877 F.3d 650 (5th Cir. 2017)........................................................36, 40

United States v. Lopez,

4 F.4th 706 (9th Cir. 2021) ...................................................................60

\*United States v. Madden,

733 F.3d 1314 (11th Cir. 2013)..........................................23, 55, 56, 57

United States v. Marks,

274 F.2d 15 (7th Cir. 1959)....................................................................51

United States v. Norwood,

982 F.3d 1032 (7th Cir. 2020).............................................................36

United States v. Rodríguez-Rodríguez,

663 F.3d 53 (1st Cir. 2011) ...................................................................61

United States v. Sewell,

90 F.3d 326 (8th Cir. 1996)....................................................................44

United States v. Tirado-Tirado,

563 F.3d 117 (5th Cir. 2009)................................................................37

United States v. Underwood,

446 F.3d 1340 (11th Cir. 2006)..........................................................22

*United States v. Vang,*

   128 F.3d 1065 (7th Cir. 1997) ................................................................ 48

*United States v. Vargas,*

   689 F.3d 867 (7th Cir. 2012) .................................................................. 45

*United States v. Weissman,*

   899 F.2d 1111 (11th Cir. 1990) .............................................................. 52

*United States v. Wolf,*

   787 F.2d 1094 (7th Cir.1986) ................................................................. 64

*Yates v. Evatt,*

   500 U.S. 391 (1991) ................................................................................ 39

**Statutes**

18 U.S.C. § 922(d)(3) .............................................................................. 53

18 U.S.C. § 1591 ................................................................... 3, 20, 21, 41

18 U.S.C. § 2246(2) ................................................................................ 60

18 U.S.C. § 2421(a) ................................................................. 3, 19, 46, 49, 64

18 U.S.C. § 2422(a) ................................................................................ 61

18 U.S.C. § 2422(b) ........................................................................... 60, 62

18 U.S.C. § 2423(a) ............................................... 3, 20, 24, 58, 60-62, 64

18 U.S.C. § 3231 ....................................................................................... 1

18 U.S.C. § 3742 ...................................................................1

28 U.S.C. §1291 ...................................................................1

**Rules and Other Authority**

11th Cir. R. 28-5 ..................................................................3

Fed. R. Evid. 803(2) ................................................ 18, 43, 44, 45

Fed. R. Evid. 804 .................................................................37

White-Slave Traffic Act ("Mann Act"),

   Pub. L. No. 277, § 2, 36 Stat. 825 (1910) ....................... 19, 20, 47-49, 51

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. §3231 because the defendant was charged with an offense against the laws of the United States. The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on December 12, 2022, from the judgment and commitment entered on November 30, 2022, which dispose of all claims between the parties to this cause with the exception of the restitution order that is the subject of a separate appeal. Mr. Carter also timely filed a separate appeal on March 8, 2023, from the amended judgment and commitment entered on March 1, 2023.

## STATEMENT OF THE ISSUES

I.    The district court violated Anthony's Sixth Amendment right to confrontation by admitting Amber's testimonial statements made to police investigators following her detention. In the alternative, the District Court erred by admitting her out-of-court statements as excited utterances.

II.   The district court constructively amended Count 2 of the superseding indictment by adopting the government's proposed jury instruction that permitted the jury to find Anthony guilty if he intended to transport A.V. For the purpose of engaging in "debauchery" thereby broadening the potential bases for conviction.

III.  The district court also constructively amended Count 4 of the superseding indictment by instructing the jury they could find Anthony guilty of a crime not charged by the grand jury.

IV.   The government failed to present sufficient evidence for Counts 2 and 4 that Anthony intended to transport A.V. and Amber for a proscribed purpose.

## STATEMENT OF THE CASE

The appellant was the defendant below and will be referred to by his name. The appellee will be referred to as the government. The record will be noted under 11th Cir. R. 28-5.

Anthony Bernard Carter ("Anthony") is incarcerated.

### Course of Proceedings and Disposition in the District Court

A federal grand jury indicted Anthony with sex trafficking of an adult by force, 18 U.S.C. §1591(a)(1),(b)(1), transporting a person to engage in prostitution and sexual activity, 18 U.S.C. §2421(a), sex trafficking of a minor, 18 U.S.C. §1591(a)(1),(b)(2),(c), and transporting a minor to engage in sexual activity, 18 U.S.C. §2423(a). (DE 51).

Before trial, Anthony filed a motion in limine that addressed, in part, the admissibility of statements made by "Amber," the woman alleged to be the minor victim, to the police after they executed the sting operation. (DE 61). Anthony objected to these statements as inadmissible hearsay and unconstitutional under *Crawford*. (DE 61:10-12). The district court denied his motion. (DE 69; DE 181:117).

Anthony proceeded to trial. The jury found him guilty of all charges. (DE 78). Later, the court sentenced Anthony to 300 months' imprisonment. (DE 124). Anthony appealed his conviction, sentence, and restitution order. (DE 125, 171).

## Statement of Facts

### Atlanta

During a visit to Atlanta, A.V. and her girlfriends were staying in hotels and engaging in sex work. (DE 182:6-7,11,49). While there, Anthony texted A.V. for an "out-call"—he asked her to meet him to engage in a commercial sex act. (DE 182:6-7). A.V. agreed to do the out-call with Anthony and met him at a nearby house. (DE 182:6-7).

Other men were at the house when she arrived, but Anthony brought her upstairs where they could be alone. (DE 182:7-8). Anthony told A.V. that she did not need "to be doing this type of stuff" and she should "choos[e] a different team." (DE 182:7). Feeling intimidated by the other men in the house, A.V. gave Anthony her money, about $800, hoping she could leave. (DE 182:8,49). She left the house and returned to her hotel. (DE 182:9).

Later that night, Anthony texted her, and she blocked him. (DE 182:9). He texted her from different numbers, telling her that she was "coming with him" and that if she did not, his "people [would] run-in" the hotel where she and her friends were staying which frightened her. (DE 182:9-10).

The next day, A.V.'s friends "made her" go to another out-call. (DE 182:11). Before she left, A.V. had her customer "verify" the date by sending her a picture of his hands showing the money she requested to have sex. (DE 182:11). When she arrived at the location, she called the number, and Anthony appeared. (DE 182:11-12). He told her she had to go back to her hotel and get her things, or he would "run-in." (DE 182:12).

A.V. got her belongings and went back to Anthony. (DE 182:12). He took her to a motel, bought her wine, and told her she "chose-up" right. (DE 182:12). He later made her have sex with him for free; she wanted the sex to be a commercial transaction. (DE 182:12-13,50).

Anthony then got A.V. a job at a local strip club where she would dance. (DE 182:14,51-52). About a week later, Anthony showed up with Amber, who A.V. described as "[v]ery, playful, sweet, funny." (DE 182:14; GX 5A). Anthony brought them to a Red Roof Inn where Amber had been

doing sex work. (DE 182:15-16; GX 31). A.V. described Amber's relationship with Anthony as "friendly." (DE 182:19).

While at the Red Roof Inn, A.V. had about 40-50 dates for which she gave Anthony money. (DE 182:18). She explained that she would be in the bathroom during Amber's sex work and vice versa. (DE 182:16). A.V. did not know whether Amber had given Anthony money for her sex work. (DE 182:15). A.V. also said that Anthony told Amber to show her "the ropes" of freelancing at a bar—meeting clients for sex work with other sex workers. (DE 182:18-19,52-53).

## **Planning a trip to Miami**

Nevertheless, because Atlanta was "slow," Anthony told A.V. and Amber they were going to Miami "around" the Super Bowl. (DE 182:19-20). A.V. testified that Anthony told her he wanted her to work in a Miami strip club. (DE 182:20). A.V. wanted to work in a strip club in Miami, too, hoping she could make money. (DE 182:55-56; DE 183:163-165;GX 57). When Amber said she wanted to work there, too, Anthony responded that she could not. (DE 182:22,56-57).

Before they left Atlanta on January 20, 2020, Anthony reached out to a contact at a club in Miami to see if they would hire A.V. to dance.

(DE 183:163-164; GX 57). Specifically, he wanted to know whether she could be hired and dance the same day. (DE 183:165; GX 57). Anthony sent his contact a picture of A.V. and asked, "You think they would hire her?" (DE 183:165 GX 57). His contact answered, "Yes." Anthony responded, "For sure? Because I'm basically coming out there just to get her hired." (DE 183:165; GX 57).

### Miami

They all drove to Miami in A.V.'s car. (DE 182:20). A.V. said that Anthony brought a gun with him that intimidated her. (DE 182:32). A.V. conceded, however, that Anthony never used the gun to hurt her. (DE 182:58).

After arriving in Miami, A.V. changed clothes at a gas station, and they went straight to the strip club. (DE 182:20). A.V. asked for a job, but the club did not hire her. (DE 182:20). They then drove to an Airbnb rental in a high-rise building with a water view. (DE 182:22-23; GX 66B7-8).

### The Sting

At the same time—during Super Bowl week in Miami—local law enforcement decided to conduct an undercover sting operation to identify

and assist juvenile and adult victims of human trafficking. (DE 181:89,149,151). Specifically, law enforcement targeted online postings offering "out-calls" in the Miami Beach area—escorts who travel to a location to meet a client to engage in a commercial sex act. (DE 181:89-90).

While conducting this operation, law enforcement became interested in an ad with a sexually provocative caption and picture. (DE 181:91,97-98; GX 1-2). The ad, viewed by the police on January 22, 2020, listed a contact phone number with an out-of-Florida 213 area code. (DE 181:91,98; GX 1-2).

Based on this investigation, Miami Beach Police Department Sergeant Laurence Villa ("Villa"), working undercover, sent text messages to the number listed in the ad to negotiate a one-hour "out-call" date for $250.00. (DE 181:98-102; GX 3). During the text message exchange, the sex worker asked Villa to send a photo of $250 with three fingers for her "safety." (DE 181:102; GX 3). Villa complied and also sent the hotel's address and room number. (DE 181:99,103; GX 3). Villa and the sex worker planned to meet at the hotel that night. (DE 181:102-103).

Subsequently, Villa received a text from the number that read, "about to call from my other number." (DE 181:103). Villa then received a phone call from a phone number with a 678-area code and spoke to a woman. (DE 181:103-105). The woman told Villa that she would be at the hotel soon. (DE 181:105). During this call, Villa heard a male voice in the background telling the female on the phone to "make sure he's not a cop." (DE 181:105). Villa told her he was not a cop. (DE 181:105).

Later, a woman knocked on the hotel door where the undercover Villa waited. (DE 181:106). When Villa opened the door, he recognized the woman from the ad. (DE 181:106). The woman introduced herself as Amber, entered the room, and held a black flip phone to her face. (DE 181:106; GX 5-6,8).

Amber asked for $250.00 and told Villa to "put on a condom." (DE 181:106-107). Villa handed Amber the money, and she sent a text message on the flip phone. (DE 181:106-107). Villa then gave a visual take-down signal to the other officers who entered the room to complete the undercover operation and detain Amber for committing a crime. (DE 181:107,159; DE 184:50-51).

Villa said that after the take-down, Amber, who was nearly 18 years old, "began to throw like a temper tantrum, she broke down in tears, she was extremely emotional, bawling, crying. She seemed like a girl not in -- not in control of her emotions. She was not able to just follow basic instructions to calm down, just relax." (DE 181:108,118,123-124; GX 6-7). Villa estimated that, within 30 seconds of the take-down, Amber told the officers, "I didn't even want to be here! I was forced to come on this date!" (DE 181:108-109,119). When the officers asked Amber who forced her to come, she stated, "Just look at my phone, I don't want to get anyone in trouble, but you can see for yourself." (DE 181:119; GX 8).

Although the officers set up a live audio feed from the hotel room, the "very faulty and old" device had no recording capability; therefore, no recording documents this exchange. (DE 181:155-156). And although some investigators carry audio recorders for interviews, Villa did not. (DE 181:157).

When Villa looked at Amber's phone, he saw a message from Amber to "Nicky" at a phone number with an out-of-state area code of 832. (DE 181:119-120). The message said, "G." (DE 181:119-120). Next, a text responded, "Get extras for your daddy." (DE 181:119-120).

10

## The Pursuit

Law enforcement then went to the hotel's security office to review video footage to see if they could discover who dropped Amber off at the hotel. (DE 181:124). The officers reviewed the footage and saw that a black sedan dropped her off a few minutes before she knocked on the hotel room's door. (DE 181:124,128; GX 9A-E).

Shortly after, at the one-hour mark for the date, Villa texted a message from Amber's phone to the 832 number that said, "Done." (DE 181:128). A text from the 832 number replied, "Coming," "in 4 min." (DE 181:129). After Villa received the text, officers saw a black sedan arrive at the hotel. (DE 181:129,131,185). At this time, Amber's phone—in Villa's possession—rang from the 832-area code number. (DE 181:130). Villa walked toward the black car with Amber's phone. (DE 181:131-132).

He saw a young Black man, later identified as Anthony, wearing a black hooded sweater and holding a phone in the car. (DE 181:130-132,187). Villa then answered the call on Amber's phone and claimed that he heard the man in the car say, "Yo! Where you at!" (DE 181:130).

Villa gave a take-down signal. (DE 181:132). A uniformed detective, gun drawn, approached the driver's side of the car and tapped on the

window. (DE 181:132-133,186,189, 203; GX 16). The detective told the driver, "Open the door, police, police." (DE 181:189). The driver did not open the window but drove off the hotel's property. (DE 181:133,189,193-194; GX 9-10). The detective and his partner followed in their car. (DE 181:134; GX 9).

Later, law enforcement found the car crashed into a street barrier a few blocks from the hotel. (DE 181:134,191). The officers could not find Anthony—the car's purported driver. (DE 181:169,191).

### Leaving Miami

While in Miami, A.V. engaged in two commercial sex acts, both with the same client. (DE 182:25-26). After arriving at the Airbnb, A.V. and Amber had a date with a customer who responded to an ad Anthony had placed. (DE 182:23-24; GX 2). On the date, Amber had sex with the client first but told A.V. he was rough, so Amber completed the date. (DE 182:25). The client gave them approximately $1,200 and drugs as payment. (DE 182:25). When they returned to the Airbnb, they gave Anthony the money and drugs. (DE 182:25). The next day, the same client contacted A.V. for a date. (DE 182:26). She met up with him again for sex, and he paid her $700, which she gave to Anthony. (DE 182:26-27).

When she returned to the Airbnb, Anthony took A.V.'s phone, her car, and Amber to a "date." (DE 182:26). A.V. then fell asleep. (DE 182:27).

She awoke to a bang on the door. (DE 182:27).When she answered, Anthony told her they had to go. (DE 182:27). A.V. said he seemed "[v]ery frantic and ... panicky." (DE 182:27). Amber was not with him, and he did not have A.V.'s car. (DE 182:27). A.V. collected her belongings, and they took an Uber to a motel. (DE 182:28).

While at the motel, A.V. had sex with Anthony because she did not feel she had a choice. (DE 182:28). After two days, they went to another motel, where they stayed for about a week. (DE 182:29). Anthony told A.V. that if the police caught her, she should say her car was stolen. (DE 182:29-30).

Eventually, Anthony obtained Greyhound bus tickets for him and A.V. to return to Atlanta, where he rented a motel room for them. (DE 181:25-27;182:29; GX 32-33). While in Atlanta, Anthony told A.V. to report her car stolen to get it back. (DE 182:29). But she learned she could only file a report in person. (DE 182:29-30).

13

During this time, she worked at a strip club where she also did sex work. (DE 182:30-31). A.V. gave the money she earned to Anthony. (DE 182:31). At a later point, A.V. left Anthony and returned home. (DE 181:27-29;182:33-34; GX 33). Ultimately, the FBI arrested Anthony in Atlanta. (DE 183:118).

### The Subsequent Investigation

When he arrived at the crash scene, Villa saw, through the car's window, an iPhone that was "screen up" and black. (DE 181:134,161-162; GX 12-13). The cell phone looked "similar" to the one Villa saw the car's driver using at the hotel. (DE 181:135). Villa seized the phone, which he later gave to crime scene investigators. (DE 181:135-136). Subsequently, the police found a Texas identification card and driver's license between the phone and its plastic case. (DE 181:139:GX 13Q, 34). The driver's license belonged to A.V. (DE 181:139; GX 13S, 34).

After Villa seized the phone, a crime scene technician sealed the car. (DE 181:135; DE 183:09). The officers obtained a state search warrant for the car, and a few days after the crash, the police executed the search. (DE 181:141; DE 183:8; GX 14).

14

The officers found several receipts from hotels and fast-food restaurants in the Miami area, including from Burger King. (DE 181:142-143; DE 183:11; GX 14). They also found bottles, a CVS receipt, FILA and Vans shoe boxes, a condom box, boots, lotion, hair products, shoes, a purse, and clothing. (DE 181:142-143; DE 183:11-17; GX 14). Crime scene technicians found Anthony's Georgia identification card underneath the driver's seat. (DE 181:175-176,181; DE 183:18-19,24; GX 17). Crime scene technicians also collected DNA swabs and latent fingerprints of value from various items and parts of the car and sent them out for further analysis. (DE 181:153-154,171; DE 183:11-12; GX 14).

Nicole Vegoda ("Vegoda"), a crime scene technician, processed various items found in the car for fingerprints—including a Gatorade and various other bottles, an Astroglide box, a FILA shoebox, and a Popeye's cup. (DE 181:216,218-221; DE 183:14-18,22-23; GX 14,21,23, 26, 27, 35, 70). Another technician, Elizabeth Revilla ("Revilla"), also lifted latent prints of possible value from the items inside the car and from the car's interior. (DE 183:19-20, 26-29; GX 14,24-27,71-72). Vegoda and Revilla submitted certain fingerprints of possible value to a latent examiner. (DE 181:221; DE 183:28-29). Vegoda also took photos of Amber and

elimination fingerprints from her. (DE 181:222-224, GX 28). When she took Amber's photograph, she did not notice any physical injuries or bruising. (DE 181:222-223,225; GX 5).

A latent print examiner, Lanett Holbrook ("Holbrook"), determined that the latent prints found on the McDonald's, Burger King, and CVS receipts appeared to be the same as Anthony's fingerprints. (DE 183:68-70; GX 9-21,27). She came to the same conclusion about the latent prints found on the Gatorade bottle and the FILA box. (DE 183:72; GX 23,26,69). According to Holbrook, Anthony also appeared to be the source for a palm print on the front center post. (DE 183:61; GX 25,27).

## Social Media

Law enforcement obtained a search warrant for Amber's black flip-phone and the iPhone found in the car. (DE 181:146; GX 8,12). The case agent created an extraction report that revealed various accounts associated with the iPhone. (DE 183:133-137; GX 12,37). After the agent discovered an Instagram account associated with Anthony named "Ghetto Prince" on the iPhone, he obtained a search warrant and pen register for that account and created various reports based upon the information he received. (DE 182:17; DE 183:136-139; GX 65-67).

A forensic review revealed photos, videos, and other content from this account—including photographs of Amber and various provocative posts. (DE 183:144-156, 231-233; GX 65-67). The account also contained direct messages between "Ghetto Prince" and others purportedly concerning sex work. (DE 183:156-183; GX 57-59,60-64). Law enforcement also created other reports based on various cellphone extractions—the black flip phone and the iPhone. (DE 183:184-221, 224-229; GX 8, 12, 36, 39-41, 43-46,52-56). These extractions yielded information about the iPhone's "contacts"—which included a contact associated with the black flip phone—and a web search, GPS, and call log history as well as various message threads. (DE 183:185-2010; GX 38,39,41,43,44,46,49,51,52).

The agent also extracted information from the black flip phone's "contacts"—which included a contact associated with the iPhone—and various message threads between Amber and Anthony that referenced sex work. (DE 183:210-222,224-228; GX 53-56).

Finally, law enforcement obtained a search warrant and generated reports from a TextNow account associated with the phone number used in the sting operation. (DE 183:229-230; GX 4).

17

## The Court's Ruling about Amber's Statements

Before trial, Anthony filed a motion in limine that addressed, in part, the admissibility of Amber's statements to the police after they executed the sting operation. (DE 61). Anthony objected to these statements as  inadmissible hearsay and unconstitutional under *Crawford*. (DE 61:10-12). The district court denied his motion. (DE 69; DE 181:117).

When Anthony raised the issue again at trial, the district court did not use the proper test to decide whether the admission of Amber's statements would violate the Confrontation Clause. The district court held: "The[] statements weren't given or taken to preserve it for future litigation. So, I don't think there's any *Crawford* violation, so they will be admissible. The issue is whether or not it is given or taken in significant part *for purposes of preserving it for potential future use in legal proceedings*." (DE 181:117) (emphasis added). The district court also overruled Anthony's objection that these statements were not excited utterances under Federal Rule of Evidence 803(2). (DE 181:116-117).

## The Jury Instructions

In Count 2, the grand jury indicted Anthony with a violation of 18 U.S.C. § 2421(a)—transporting a person to engage in prostitution or sexual activity. (DE 51:2). Before trial, the prosecutor submitted a proposed jury instruction that the court later adopted. (*Cf*. DE 76:15 *with* DE 55:17).

> The court's instruction provided:
>
> 'Prostitution' has the same meaning as the term 'commercial sex act,' it means any sex act, on account of which anything of value is given to or received by any person. ln determining whether the Defendant intended that the individual would engage in prostitution, it is not necessary for you to find that the sole and single purpose of the transportation was prostitution. It is enough that one of the dominant purposes was prostitution *or debauchery*.

(DE 76:15)(emphasis added). The district court did not define "debauchery." (DE 76:15).

For support, the government cited *Hattaway v. United States*, 399 F.2d 431, 433 (5th Cir. 1968). (DE 55:17). *Hattaway* did, in 1968, set out the elements of a Mann Act violation that reflects the government's proposed instruction: "1) The interstate transportation of a woman or girl 2) *for purposes of prostitution, debauchery or other immoral purposes*, and 3) doing such act or acts knowingly and willfully. *Id*. (emphasis added).

19

But Congress had removed the "debauchery or other immoral purposes" from the Mann Act about 18 years after *Hattaway* and 35 years before Anthony's trial.

In Count 4, the grand jury charged Anthony with violating 18 U.S.C. § 2423(a). The text of § 2423(a) provides: "A person who knowingly transports an individual who has not attained the age of 18 years . . . with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ." *Id*. The grand jury, however, did not allege that Anthony knowingly transported a minor with the intent that they engage in prostitution. Instead, the grand jury only alleged that he intended the minor to engage "*in any sexual activity* for which any person can be charged with a criminal offense." (DE 51:3) (emphasis added). Notwithstanding the grand jury's decision, the district court instructed the jury that they could find Anthony guilty if the government proved that he intended the minor to engage in *prostitution*—the uncharged option. (DE 76:19).

For Count 3, the government again proposed an erroneous jury instruction that the district court adopted. In Count 3, the grand jury charged Anthony, under 18 U.S.C. § 1591(a)(1), (b)(2), and (c), with sex

trafficking of a minor knowing or, in reckless disregard of the fact, that she was not 18-years-old. (DE 51:2-3). Section 1591(a)(1) also criminalizes sex trafficking of a minor through coercion. But the grand jury did not charge Anthony with this separate offense. (DE 51:2-3).

Notwithstanding, the government submitted a proposed instruction for Count 3 that included a definition of "coercion:"

> (a) threats of serious harm to or physical restraint against any person;
>
> (b) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
>
> (c) the abuse or threatened abuse of law or the legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law  was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
>
> "Serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

(DE 55:21). The district court included this definition in his instructions to the jury. (DE 76:17-18).

## Standards of Review

Whether out-of-court statements are "testimonial" for purposes of the Confrontation Clause is a question of law that this Court reviews *de novo. See generally Crawford v. Washington,* 541 U.S. 36, 68 (2004); *United States v. Underwood,* 446 F.3d 1340, 1345 (11th Cir. 2006). This Court reviews Confrontation Clause violations for harmless error. *United States v. Hunerlach,* 197 F.3d 1059, 1067 (11th Cir.1999). The prosecution has the burden of showing that a constitutional trial error is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24 (1967).

The district court's decision to admit statements over a hearsay objection is reviewed for an abuse of discretion. *United States v. Kent*, 93 F.4th 1213, 1217 (11th Cir. 2024).

The legal correctness of a jury instruction is reviewed *de novo,* but for plain error if no objection was made. *United States v. Isnadin*, 742 F.3d 1278 (11th Cir. 2014). This Court reviews *de novo* whether a district court's instructions constructively amended an indictment. *United States v. Gutierrez*, 745 F.3d 463, 473 (11th Cir. 2014). When a defendant fails to object that the jury instructions constructively amended the

indictment, the review is for plain error. *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).

This Court engages in a *de novo* review to determine whether there is sufficient evidence to support a conviction. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009).

## SUMMARY OF THE ARGUMENTS

Amber did not testify at Anthony's trial. But the jury did hear the statements she made to the police after the "take-down"—statements that directly implicated Anthony and exculpated her. (DE 181:108-109,119; DE 184:50). Due to her absence from trial, however, Anthony could not confront this key witness against him. Because Amber's statements were testimonial, introduced for the truth, and Anthony never had a prior opportunity to cross-examine her, the district court violated his right to confrontation by allowing the jury to hear her statements.

Furthermore, the government constructively amended the indictment. For Count 2, the grand jury did not indict Anthony for transporting A.V. for her to engage in "debauchery." (DE 51:2). Nor could they—this act has not been a federal criminal offense since 1986.

23

Notwithstanding, the district court adopted the government's proposed jury instruction that explicitly permitted the jury to find Anthony guilty under this antiquated theory. (DE 55:17;76:15). Therefore, the court's erroneous jury instruction—invited by the government's submission—constructively amended the indictment by broadening the potential bases of conviction.

The district court made a different constructive amendment error instructing the jury about the elements of Count 4. In Count 4, the grand jury charged Anthony with violating 18 U.S.C. § 2423(a). The text of § 2423(a) provides: "A person who knowingly transports an individual who has not attained the age of 18 years . . .  with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ." *Id*. The grand jury, however, did not allege that Anthony knowingly transported a minor with the intent that she engage in prostitution. Instead, the grand jury only alleged that he intended the minor to engage "*in any sexual activity* for which any person can be charged with a criminal offense." (DE 51:3) (emphasis added). The district court erred by instructing the jury that they could

24

find Anthony guilty if the government proved that he intended the minor to engage in *prostitution*—the uncharged option. (DE 76:19).

Finally, the government presented insufficient evidence for Counts 2 and 4. During A.V.'s testimony, the prosecutor *never* asked her if she understood that Anthony wanted her to travel to Miami to do sex work. And, as previously discussed, the government did not call Amber as a witness. The government did, however, present evidence about why Anthony wanted A.V. to go to Miami—to get a job dancing at a local strip club. This evidence negates the intent requirement for Counts 2 and 4— that before crossing state lines, Anthony knowingly transported A.V. and Amber for the purpose of engaging in prostitution or proscribed sexual activity.

## ARGUMENTS AND CITATIONS OF AUTHORITY

## ISSUE I

**THE DISTRICT COURT VIOLATED ANTHONY'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY ADMITTING AMBER'S TESTIMONIAL STATEMENTS MADE TO POLICE INVESTIGATORS FOLLOWING HER DETENTION. IN THE ALTERNATIVE, THE DISTRICT COURT ERRED BY ADMITTING HER OUT-OF-COURT STATEMENTS AS EXCITED UTTERANCES.**

Amber did not testify at Anthony's trial. But the jury did hear the statements she made to the police after her "take-down"—statements that directly implicated Anthony and exculpated her. (DE 181:108-109,119; DE 184:50). Due to her absence from trial, however, Anthony could not confront this key witness against him. Because Amber's statements were testimonial, introduced for the truth, and Anthony never had a prior opportunity to cross-examine her, the district court violated his right to confrontation by allowing the jury to hear her out-of-court statements. Accordingly, this Court should vacate his convictions.

**A.    The Confrontation Clause bars the use of "testimonial" statements which include witness statements made to investigating police officers—like the statements made by Amber to the investigating officers who detained her after the sting operation.**

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him...." In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court held that consistent with the Confrontation Clause guarantee, a "testimonial" statement made by a declarant who does not testify at trial is admissible against an accused *only* if the declarant is unavailable, and the accused was afforded a prior opportunity for cross-examination. *Id.* at 59, 68-69.

Although *Crawford* did not formulate a definition for "testimonial" statements, the Supreme Court emphasized that under any definition, "[s]tatements taken by police officers in the course of interrogations" are testimonial statements. *Id.* at 52-53. Based upon the historical background and the principal evil at which the Framers directed the Confrontation Clause, courts, starting with the Supreme Court, have broadly defined interrogation that meets *Crawford*'s testimonial standard. *See Davis v. Washington*, 547 U.S. 813, 822 n.1 (2006) ("The

27

Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation."); *see also Crawford*, 541 U.S. at 53 n.4 (noting that the Court, for Confrontation Clause purposes, uses "the term 'interrogation' in its colloquial, rather than any technical legal, sense.").

In *United States v. Arbolaez*, 450 F.3d 1283 (11th Cir. 2006), for example, the defendant argued that the district court erred in allowing a government agent to recount for the jury the post-arrest statements made by a co-conspirator about the defendant's participation in the conspiracy. *Id*. at 1289. This Court agreed that the admission of this testimony violated the Confrontation Clause. *Id*. at 1291. First, the Court recognized that "statements taken by police officers in the course of interrogations are *definitively* testimonial" and thus fall within the protection afforded by the Confrontation Clause." *Id*. (cleaned up). Second, the Court found that testimonial statements include not only "'technical legal' interrogations but also "witness statements given to an investigating police officer." *Id*. The Court concluded that because the co-conspirator's statements fell into that latter category and the defendant

28

had no opportunity to cross-examine the declarant co-conspirator, the district court plainly erred under *Crawford* by allowing an agent to relate them to the jury. *Id*. This same analysis and result applies here.

Amber made her statements to investigating officers after they detained her for engaging in a commercial sex transaction. (DE 181:108-109,118-119,123-124; GX 6-8). Like the co-conspirator's statements in *Arbolaez*, Amber's statements about Anthony fall into *Crawford*'s "latter category"—statements made to investigating officers—and the Court should deem them testimonial and a Sixth Amendment violation. *Arbolaez*, 450 F.3d 1291; *see also Davis,* 547 U.S. 813, 822 n.1 (stressing that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.").

**B.  An objective evaluation of the circumstances demonstrates that Amber's statements were testimonial because the primary purpose of her statements was to inform the investigating police officers that Anthony forced her to engage in the sex work for which they had detained her.**

An objective inquiry of the circumstances surrounding Amber's statements confirms this proposition. The Supreme Court has instructed that *Crawford* requires a court to "objectively evaluate the circumstances

in which the encounter occurs and the statements and actions of the parties" to determine "the primary purpose of the interrogation." *Michigan v. Bryant,* 562 U.S. 344, 358-359 (2011). Under an objective evaluation, Amber's interaction with the police would lead a witness reasonably to believe that her statements would be available for use at a later trial. *See id*; *United States v. Curbelo*, 726 F.3d 1260, 1272 (11th Cir. 2013) (testimonial statements include statements that are the "functional equivalent" of in-court testimony, such as affidavits, depositions, prior testimony and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."); *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005) ("statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial.").

As set out above, the district court's objective inquiry is to determine whether the circumstances would lead a witness reasonably to believe that the *statement would be available for use* at a later trial. *See id*. The district court, however, did not use the proper test to decide

30

whether the admission of Amber's statements would violate the Confrontation Clause. The district court held: "The[] statements weren't given or taken *to preserve it* for future litigation. So, I don't think there's any *Crawford* violation, so they will be admissible. The issue is whether or not it is given or taken in significant part *for purposes of preserving it for potential future use in legal proceedings*." (DE 181:117) (emphasis added).

The proper test, illustrated by *Curbelo*, requires less formality and focuses more broadly on whether an objective witness would reasonably believe that *the statement would be available for use at trial. Curbelo*, 726 F.3d at 1272. Analyzing the issue from this different and correct perspective demonstrates that Amber's statements were testimonial.

First, based on the content and context of the encounter, a reasonable witness would have understood law enforcement's primary purpose to be investigative. *United States v. Cooper*, 926 F.3d 718, 731 (11th Cir. 2019) (recognizing that statements to police officers are generally testimonial if the primary purpose is investigative). Here, the police orchestrated a sting operation to investigate potential human trafficking. (DE 181:89-90,149,151). Furthermore, once the "take-down"

31

occurred and the police detained Amber, the lead detective, in his own words, "took over" to handle the victim and "*investigate further*." (DE 181:111; *see also* DE 184:50-51)(emphasis added). Other officers told Amber what they "were doing there," what their "purpose was, which was her welfare and whether there was human trafficking *investigators* [sic]." (DE 181:110)(emphasis added).

Based on these circumstances, there can be no doubt that both Amber and the police understood the context of their encounter to be investigative. Amber, after her detention, knowingly and intentionally spoke to investigating officers. (DE 181:108-109,119). Her statements described Anthony's criminal activity and identified him as her trafficker, thereby exculpating herself. *Id*.; *see also* (DE 184:50-51—where case agent explained that the police detained Amber for committing a crime, but she became a victim *after* speaking to the police). By shifting blame, Amber intended to offer her statements against Anthony, and a reasonable witness would anticipate this statement being available to be used against the accused in investigating and prosecuting the crime.

Second, the interaction between Amber and the police was formal.

32

After the undercover issued the "take-down" signal, the police team entered the room and focused their attention on Amber. (DE 182:107-108-118); *Cf. United States v. Hano*, 922 F.3d 1272, 1287 (11th Cir. 2019) (statements were non-testimonial because they arose from a "friendly and informal exchange in which [the declarant] happened to reveal evidence that would ultimately be critical to the government's case."). Unlike *Hano*, this Court cannot reasonably view Amber's encounter with the police investigators as friendly and informal.

Third, Amber's statements reported "what happened"—why she came to the hotel room rather than "what is happening." *Davis*, 547 U.S. at 829-30 (2006) (concluding statements were testimonial because the officer was seeking to determine "what happened" and "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.).

Based on an objective view of the circumstances, the primary purpose of the encounter was to establish past facts—what or who caused Amber to be in the hotel room attempting to engage in sex work. Indeed, the prosecution introduced Amber's statements as proof that Anthony

trafficked her. *See*, *e.g.*, (DE 182:192). The circumstances of Amber and the police's interaction—that the officers had detained her for engaging in a commercial sex transaction, the officers told her that they were there to investigate, and her statements shifted the responsibility for her presence in the hotel room to another person— would lead an objective witness to reasonably believe that their statements would be available for use at trial. (DE 181:108,118,123-124; GX 6-7).

Under *Crawford*, therefore, Amber's statements were testimonial. Moreover, the government sought admission of Amber's statements to prove the truth of the matter asserted *See Crawford,* 541 U.S. at 59 n. 9. ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Because Anthony did not have the opportunity to cross-examine Amber at trial, the admission of her statements violated the Confrontation Clause.

## C. The government never asserted, and the facts did not demonstrate that the primary purpose of Amber's statements was not to enable police assistance to meet an ongoing emergency.

The government never asserted, and therefore has waived, the argument that Amber's statements were made to enable the police to

respond to an emergency. And for good reason. The Supreme Court has noted that "the existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution'"—instead the purpose is "end[ing] a threatening situation." *Michigan v. Bryant*, 562 U.S. 344, 366 (2011) (quoting *Davis,* 547 U.S. at 822). "Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Id.*

Here, the police officers were on the scene to conduct an undercover sting operation and investigate what they believed to be human trafficking. (DE 181:89-90). After the police detained Amber—in a private, not public setting—they told her that they were there to investigate whether human trafficking was occurring. (DE 181:110-11; DE 184:50-51). Amber's statements to the police did not describe ongoing events; instead, she explained what brought her to the hotel room and identified a human trafficking suspect. (DE 181:108-109,119); *Cf. Davis*,

547 U.S. at 828. Furthermore, there was no ongoing emergency because the police would not have released Amber to Anthony's custody. *See United States v. Norwood*, 982 F.3d 1032, 1050 (7th Cir. 2020) (finding no ongoing emergency when minor who the defendant had beaten made statements in a medical evaluation because there was no risk she would be released to him). Finally, there was no ongoing threat to the general public or law enforcement. Therefore, the police were not confronted with an "ongoing emergency" or ending a threatening situation. In sum, the government did not establish that Amber's statements fell into *Crawford*'s "ongoing emergency" category. *See United States v. Kizzee*, 877 F.3d 650, 656 (5th Cir. 2017) (recognizing that the prosecution has the burden of "defeating a properly raised Confrontation Clause objection by establishing that its evidence is non-testimonial." (cleaned up)).

## D. The government failed to prove that Amber was unavailable.

As highlighted above, the Confrontation Clause "bars the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53–54. A witness is considered unavailable for Confrontation Clause purposes if

36

"the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Ohio v. Roberts,* 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford,* 541 U.S. at 60–68. The government "bears the burden of establishing that a witness is unavailable." *Roberts,* 448 at 74. Under Federal Rule of Evidence 804(a)(5)(A), a witness is unavailable if they are "absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance." *See United States v. Tirado-Tirado*, 563 F.3d 117, 123 n.4 (5th Cir. 2009) (noting that the Confrontation Clause unavailability inquiry is identical to the unavailability inquiry under Rule 804(a)(5)). The government failed to offer any evidence that they had made reasonable efforts to procure Amber's appearance at Anthony's trial under Rule 804.

Before trial, the government filed a motion in limine asserting that Amber's statements were admissible as excited utterances. (DE 52:20-21). In the motion, the government pointedly noted that these statements are "not excluded by the rule against hearsay, *regardless of whether the declarant is available as a witness.*" (DE 52:20) (emphasis added).

Furthermore, the government informed the court that Villa—and not Amber—would recount these statements to the jury. (DE 52:21).

At a status conference held a few days before the trial started, the prosecutor commented—during a discussion about A.V.— that "we don't have the minor victim." (DE 158:5). The court followed up and asked, "When you say you don't have the minor victim, what do you mean by that?" (DE 158:5). The prosecutor replied, "The minor victim will not be testifying." (DE 158:5). The government never proffered why Amber could not testify at the trial, or any efforts they made to obtain her presence at trial. Accordingly, the government failed to prove Amber's unavailability and violated Anthony's Confrontation Clause rights.

## E. The government cannot show beyond a reasonable doubt that the district court's error was harmless.

A constitutional error is harmless only if the government proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 22 (1967). In other words, "[t]o say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991).

38

The Supreme Court has directed courts to consider numerous factors in assessing whether the erroneous admission of testimonial evidence that violated the Confrontation Clause was harmless to the defendant. These factors include the importance of the testimony to the government's case, the cumulative nature of the evidence, the existence of corroborating evidence, the extent of cross-examination allowed in the case, and the strength of the government's case as a whole. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986).

This Court cannot view the trial court's constitutional error as "unimportant." *Yates,* 500 U.S. at 403. The grand jury identified Amber as the victim in Counts 3 and 4, and Anthony contested that he trafficked and transported Amber. For Count 3, the government had to prove that Anthony knew or was in reckless disregard that Amber would be caused to engage in a commercial sex act. (DE 76:16). Also, although Count 3 did not require the government to prove that Anthony coerced Amber into engaging in a commercial sex act, the district court nevertheless provided the jury with a comprehensive definition of coercion. (DE 76:17-18). For Count 4, the government had to prove that Anthony transported Amber, intending that she engage in prostitution. (DE 76:16-19). Therefore,

Amber's out-of-court statements that he forced her to go to the hotel to engage in commercial sex were highly incriminatory and critical to the government's case to prove both Counts 3 and 4; furthermore, as discussed below, the government used her statements to bolster the proof for Counts 1 and 2. (DE 182:192).

Importantly, the government introduced no evidence besides Amber's out-of-court statements that Anthony "forced" her to go to the hotel room. Amber's statements did not duplicate other evidence, and this Court cannot consider her statements to be cumulative. Nor could Anthony confront Amber through other witnesses.

Moreover, the government did not corroborate Amber's statements by other evidence. *Kizzee*, 877 F.3d at 662 (5th Cir. 2017) (highlighting that no other witness provided testimony from personal knowledge about the same subject matter in finding the *Crawford* violation harmful). While A.V. testified that Anthony coerced her to engage in sex trafficking, A.V. did not offer any testimony that he coerced Amber. Rather, A.V. described Amber's relationship with Anthony as "friendly." (DE 182:19). The importance of this evidence was magnified because Amber's testimonial statements were the *only* evidence on this issue.

This testimony bears specifically on Count 3. In Count 3, the grand jury charged Anthony, under 18 U.S.C. § 1591(a)(1), (b)(2), and (c), with sex trafficking of a minor knowing, or, in reckless disregard of the fact, that she was not 18-years-old. (DE 51:2-3). Section 1591(a)(1) also criminalizes sex trafficking of a minor through coercion. But the grand jury did not charge Anthony with this separate offense. (DE 51:2-3).

Notwithstanding, the government submitted a proposed instruction for Count 3 that included a definition of "coercion:"

> (a) threats of serious harm to or physical restraint against any person;
>
> (b) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
>
> (c) the abuse or threatened abuse of law or the legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law  was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
>
> "Serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

(DE 55:21). The district court included this definition in the instructions

41

he gave to the jury. (DE 76:17-18). The inclusion of this improper instruction, combined with Amber's testimonial statements, undoubtedly sowed confusion during deliberations and prejudiced Anthony.

Finally, in closing argument, the government referred to Amber's statements as part of the "Gold Standard" of evidence they presented to the jury—not only for the counts that named Amber but the other counts as well. (DE 182:192). The phrase "gold standard" refers to the "best of the best." For example, District Judge Catherine C. Blake, former Chair of the Judicial Conference's Defender Services Committee noted the Criminal Justice Act "[has] been called the gold standard of public defense." *See* https://www.uscourts.gov/news/2014/08/20/criminal-justice-act-50-years-landmark-right-counsel (last accessed June 27, 2024).

By asserting to the jury that Amber's testimonial statements were part of the "gold standard of evidence" they presented, the government cannot show beyond a reasonable doubt that this unconstitutional evidence was harmless. *United States v. Alvarado-Valdez*, 521 F.3d 337, 342–43 (5th Cir. 2008) (noting that the government relied upon tainted evidence in closing argument). While this evidence was particularly

42

harmful to Anthony's defense of Counts 3 and 4, by tying the unconstitutional evidence to the government's entire case, the district court's error also infected Counts 1 and 2. This is especially true because the government asserted that Anthony did force and coerce A.V. to engage in commercial sex acts. As a result of the district court's erroneous admission of Amber's testimonial statements, this Court should vacate Anthony's convictions.

## F.    In the alternative, the district court erred by admitting Amber's out-of-court statements as excited utterances.

After the police detained Amber, she threw, in Villa's words, a "temper tantrum"' that shifted the blame to Anthony. These statements were not excited utterances under Federal Rule of Evidence 803(2); they were self-serving exculpations.

Under Rule 803(2), the excited-utterance exception has three requirements for which the government bears the burden: (1) the occurrence of a startling event; (2) the declarant made the statement while under the stress of the event; and (3) a nexus between the content of the statement and the event. *United States v. Irizarry-Sisco*, 87 F.4th 38, 45 (1st Cir. 2023); *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1314 (11th Cir. 2022). Amber's exculpatory statements to police

43

after her detention were not admissible under Rule 803(2) because her detention does not qualify as a startling event, and her statements did not relate to her detention.

First, Amber, an experienced sex worker, made statements after her detention in an "effort to explain the situation and to exculpate h[er]self, not one[s] made under the "sway of excitement," that caused h[er] to "lose the capacity of reflection and thus produce[ ] statements free of fabrication." *United States v. Kelly*, No. CRIM.A. 04-605, 2014 WL 6676593, at *11 (E.D. Pa. Nov. 21, 2014) *(*quoting *Miller v. Keating,* 754 F.2d 507, 512 (3d Cir.1985)), *vacated and remanded on other grounds*, 663 F. App'x 222 (3d Cir. 2016). In other words, where the police detain a person after knowingly engaging in criminal activity, only the briefest reflection is required "to conclude that a denial and plea of ignorance is the best strategy." *United States v. Sewell*, 90 F.3d 326, 327 (8th Cir. 1996). Even during a "temper tantrum," Amber had sufficient time to reflect on her statement and the government failed to demonstrate her statements were made under the stress of the event as required by Rule 803(2).

44

Second, Amber's statement to Villa did not relate to any incident that occurred *at the time of her detention*. Instead, Amber's statements related to earlier events—why she was at the hotel. Therefore, the district court erred by admitting her statements as excited utterances. *See United States v. Vargas*, 689 F.3d 867, 877 (7th Cir. 2012)(assuming that arrest qualifies as a "startling event," defendant's statement did not relate to the arrest; rather the statement related to a prior event—his arrival at a sting operation);*United States v. Alarcon-Simi*, 300 F.3d 1172, 1175–76 (9th Cir. 2002) (upholding district court's decision to exclude defendant's exculpatory post-arrest statements under Rule 803(2) because they related to earlier events). The government also failed to satisfy this Rule 803(2) factor.

The district court's decision to admit Amber's statements as excited utterances constituted an abuse of discretion. And the court's error was not harmless for the reasons stated, *supra*, at pp. 38-43. This Court should vacate Anthony's convictions.

**ISSUE II**

**THE DISTRICT COURT CONSTRUCTIVELY AMENDED COUNT 2 OF THE SUPERSEDING INDICTMENT BY ADOPTING THE GOVERNMENT'S PROPOSED JURY INSTRUCTION THAT PERMITTED THE JURY TO FIND ANTHONY GUILTY IF HE INTENDED TO TRANSPORT A.V. FOR THE PURPOSE OF ENGAGING IN "DEBAUCHERY" THEREBY BROADENING THE POTENTIAL BASES FOR CONVICTION.**

The grand jury did not indict Anthony for transporting A.V. for her to engage in debauchery. (DE 51:2). Nor could they—this act has not been a federal criminal offense since 1986. Notwithstanding, the district court adopted the government's proposed jury instruction that explicitly permitted the jury to find Anthony guilty under this antiquated theory. (DE 55:17;76:15). Therefore, the court's erroneous jury instruction—invited by the government's submission—constructively amended the indictment by broadening the potential bases of conviction. This Court should vacate Anthony's conviction for Count 2.

In Count 2, the grand jury indicted Anthony with  violating 18 U.S.C. § 2421(a)—transporting a person to engage in prostitution. (DE 51:2). At the conclusion of the case, the court correctly instructed the jury that for this count, the government must prove, beyond a reasonable

46

doubt, that: "the Defendant knowingly transported the individual named in the Superseding Indictment in interstate commerce; and the Defendant intended that the individual would engage in prostitution." (DE 76:15).

> But the court incorrectly instructed the jury that:

> 'Prostitution' has the same meaning as the term 'commercial sex act,' that is it means any sex act, on account of which anything of value is given to or received by any person. In determining whether the Defendant intended that the individual would engage in prostitution, it is not necessary for you to find that the sole and single purpose of the transportation was prostitution. It is enough that one of the dominant purposes was prostitution *or debauchery*.

(DE 76:15)(emphasis added). The district court did not define the word "debauchery." (DE 76:15).

As previously noted, the district court adopted the government's proffered instruction that permitted a convict under a debauchery theory. (*Cf*. DE 76:15 *with* DE 55:17). For support, the government cited *Hattaway v. United States*, 399 F.2d 431, 433 (5th Cir. 1968). (DE 55:17). *Hattaway* did, in 1968, set out the elements of a Mann Act violation that reflects the government's proposed instruction: "1) The interstate transportation of a woman or girl 2) *for purposes of prostitution, debauchery or other immoral purposes*, and 3) doing such act or acts

47

knowingly and willfully. *Id.* (emphasis added). But Congress had removed the "debauchery or other immoral purposes" from the Mann Act about 18 years after *Hattaway* and 35 years before Anthony's trial.

As background, over 100 years ago, Congress passed the Mann Act out of a hysteria that "white slavers" were preying upon young women, coercing them into prostitution through threats, intimidation, and force. *See United States v. Vang*, 128 F.3d 1065, 1069–70 (7th Cir. 1997); David J. Langum, *Crossing Over the Line: Legislating Morality and the Mann Act* 3–4 (2006). Section 2 of the Act stated:

> [A]ny person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any Territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute *or to give herself up to debauchery, or to engage in any other immoral practice* ... shall be deemed guilty of a felony ....

White-Slave Traffic Act ("Mann Act"), Pub. L. No. 277, § 2, 36 Stat. 825 (1910) (emphasis added), *current version* at 18 U.S.C. § 2421.

Not surprisingly, Congress has amended the statute several times in the last century. *See Vang*, 128 F.3d at 1069 (recounting the history). In a 1986 amendment, Congress, among other changes, narrowed the

statute's coverage to illegal sexual activity and *retired* the criminal concepts of debauchery and immortality as follows:

> Whoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title, or imprisoned not more than five years, or both.

*See* PL 99–628 (HR 5560), PL 99–628, November 7, 1986, 100 Stat 3510.

The government, of course, prosecuted Anthony under the current version of the offense, which does not criminalize transporting a person in interstate commerce for the purpose of "debauchery." 18 U.S.C. § 2421(a). Therefore, the government's requested jury instruction and the district court's actual jury charge expanded the bases for criminal liability to the pre-1986 version of the Mann Act.

"A fundamental principle stemming from [the Fifth Amendment] is that a defendant can only be convicted for a crime charged in the indictment," as "[i]t would be fundamentally unfair to convict a defendant on charges of which he had no notice." *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). An indictment is amended "when the essential elements of the offense contained in the indictment are altered to broaden

49

the possible bases for conviction beyond what is contained in the indictment." *United States v. Dennis*, 237 F.3d 1295, 1299 (11th Cir. 2001). A jury instruction that allows the jury to consider and convict upon an alternative element of the offense—one not listed in the indictment—is an impermissible constructive amendment and constitutes reversible error. *Stirone v. United States*, 361 U.S. 212, 218–19 (1960).

Here, the district court's instruction impermissibly broadened the possible bases for conviction. In setting out the elements of Count 2, the court instructed the jury to find Anthony guilty if he knowingly transported A.V. with the intent she engage in prostitution or criminal sexual activity. (DE 76:15). But the court went astray in defining the critical word "prostitution" to include debauchery. (DE 76:15)(emphasis added).

The district court did not further define "debauchery," which exacerbated the problem. The dictionary definition of debauchery is "[e]xcessive indulgence in sensual pleasures; sexual immortality or excesses." Black's Law Dictionary 486 (10th ed. 2014). Therefore, debauchery is not necessarily currently illegal. Numerous cases support this understanding.

50

As the Seventh Circuit long ago recognized, "Debauchery as used in the Mann Act is a broad term and *includes all sexual immoralities, whether for hire or not for hire, or for cohabitation*." *United States v. Marks*, 274 F.2d 15, 18 (7th Cir. 1959) (emphasis added). A decade before *Marks*, the Supreme Court noted that although Congress aimed the Mann Act "'primarily' at the use of interstate commerce for the conduct of the white slave business," they found "no indication" that the statute required a "profit motive." *Cleveland v. United States*, 329 U.S. 14, 18 (1946). The Supreme Court further found that debauchery is not limited to "sexual relations for hire." *Id*. Instead, the term signifies "the indulgence which the term suggests may be motivated solely by lust." *Id*. *Cleveland* cited this definition of debauchery: "Vicious indulgence in sensual pleasures. 3 Oxford English Dictionary 79; Excessive indulgence in sensual pleasures of any kind; gluttony; intemperance; sexual immorality; unlawful indulgence of lust. 3 Century Dict.Rev.Ed. 1477." *Id*. at n.4 (cleaned up).

A court's jury instruction that constructively amends an indictment constitutes *per se* reversible error because the instruction violates a defendant's Fifth Amendment right to be tried only on charges presented

by a grand jury and creates the possibility that the defendant may have been convicted on grounds that the indictment did not allege. *United States v. Gray*, 94 F.4th 1267, 1270 (11th Cir. 2024); *United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir. 1990). By incorrectly informing the jury that they could convict Anthony under a broader "debauchery" theory, the district court constructively amended the indictment and violated his Fifth Amendment right to due process. *See United States v. Davis*, 854 F.3d 601 (9th Cir. 2017) (in a sexual exploitation case, the court's instructions constructively amended the indictment by "provid[ing] the jury a path to conviction that was not alleged in the indictment.").

Like *Davis*, *United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) is analogous. The grand jury charged the defendants with violating the Clean Water Act. *Id.* at 1092. Specifically, the grand jury charged the defendants with knowingly violating the Clean Air Act by leaving scraped asbestos-containing debris on floors and other surfaces, where it was allowed to dry out, instead of placing the debris, while wet, into leak-proof containers for removal from the site. *Id.* at 1093. The trial court correctly defined the offense as charging the defendants knowingly failed

or knowingly caused any employee to fail to comply with the work practice standards alleged in the indictment. *Id*. at 1095. But, in defining "work practice standards," the district court added a standard that the grand jury did not allege in the indictment. *Id*. Therefore, the district court's instruction "permitted the jury to convict the defendants of violating a work practice standard they were not charged in the indictment …." *Id*. The court of appeals held that the district court plainly erred and reversed the defendants' convictions. *Id*. at 1096.

*United States v. Collins*, 350 F.3d 773, 777 (8th Cir. 2003) is another helpful example. In *Collins*, the Court of Appeals held that the district court's instructions to the jury constructively amended the indictment and constituted *per se* reversible error. *Id*. In *Collins*, the grand jury charged a violation of 18 U.S.C. § 922(d)(3) that made it "unlawful for a person to dispose of a firearm to any person "knowing or having reasonable cause to believe that such person ... *is* an unlawful user of or addicted to a controlled substance." *Id*. at 775 (emphasis added). The district court instructed the jury, however, that they could find the defendant guilty if he "reasonably believed there was a risk that the

53

person  would be an unlawful user while in control of the firearms. The Court held that this "broadened the scope of the statute considerably." *Id*. at 777. In particular, the court reasoned that the "statute requires an evaluation of [the person's] status as an unlawful user at the time of the disposal of the firearms to him; the district court's instruction, however, focused the jury on [the person's] status as an unlawful user at any point after the firearms were in his possession," which "significantly altered the nature of the charges [the defendant] faced." *Id*. While the parties disagreed about the standard of review, this court held, "Even if we were to review the jury instruction for plain error, however, we would still reverse." *Id*.

Here, the district court made the same kind of error. While the court correctly outlined the offense, the court's definition of how a person could commit the offense provided a path to conviction that the grand jury did not charge in the indictment.

The government's proposed jury instruction led the district court to commit plain error. Under this standard of review, Anthony must establish (1) an error, (2) that is plain, (3) that has affected his

substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

*United States v. Madden,* 733 F.3d 1314 (11th Cir. 2013) is instructive. In *Madden*, this Court held that a district court's constructive amendment of the indictment met the plain-error standard for reversal. *Id.* at 1323. There, while the indictment alleged that the defendant "did knowingly use and carry a firearm during and in relation to a crime of violence and did knowingly possess a firearm *in furtherance of* a drug trafficking crime," the jury instructions stated that "[t]he superseding indictment alleges that the defendant knowingly carried a firearm *during and in relation to* a drug trafficking offense or possessed a firearm in furtherance of a drug trafficking offense." *Id.* at 1318 (emphasis added). In other words, the instructions allowed for a conviction of carrying a firearm *during and in relation to* a drug trafficking offense, but the indictment charged the defendant with possessing a firearm only *in furtherance of* a drug trafficking offense. The Court noted in that case that "adding 'during and in relation to' broadened the possible bases for conviction beyond what was specified in

the superseding indictment," because "'in furtherance of' is narrower than 'during and in relation to.'" *Id.*

This Court held the trial court plainly erred. First, the trial court committed error because "constructively amending an indictment is a departure from the legal rule that a defendant can only be convicted for a crime charged in the indictment." *Id.* at 1322. Second, the error was plain because "[i]t [was] clear that 'in furtherance of' and 'during and in relation to' are alternative methods of conviction[,] [a]nd it [was] clear under current law that a court errs when it allows for an alternative method of conviction that is not included in the indictment." *Id.* Third, the error affected Madden's substantial rights because "Madden may well have been convicted on a charge not in the indictment." *Id.* Fourth, this Court "f[ou]nd it self-evident ... that the error seriously affect[ed] the fairness, integrity and public reputation of judicial proceedings." *Id.*

Here, there can be no question that the district court erred, and that error was plain for the same reasons articulated in *Madden*. Furthermore, the court's erroneous jury instruction affected Anthony's substantial rights. As previously discussed, Amber did not testify. And the government introduced no direct evidence that Anthony transported

her with the intention that she engage in prostitution. There was, however, evidence that Anthony intended A.V. to strip in a club while in Miami. Although A.V. testified that Anthony did not want Amber to work as a stripper in Miami, the jury could have concluded that she was brought to Miami for immoral purposes—an alternative path to conviction not charged by the grand jury. *Madden*, 733 F.3d at 1332.

Finally, the law prohibits constructive amendments to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's Sixth Amendment right to be informed of the charges against him. These rights are at the very core of our criminal legal system. Undermining these principles by allowing a constructive amendment seriously impairs the fairness and integrity of the judicial proceeding. *Id*.

Under *Madden,* the district court committed plain error by constructively amending the indictment. This Court should vacate Anthony's conviction for Count 2.

## ISSUE III

### THE DISTRICT COURT ALSO CONSTRUCTIVELY AMENDED COUNT 4 OF THE SUPERSEDING INDICTMENT BY INSTRUCTING THE JURY THEY COULD FIND ANTHONY GUILTY OF A CRIME NOT CHARGED BY THE GRAND JURY.

The district court made a different constructive amendment error instructing the jury about the elements of Count 4. In Count 4, the grand jury charged Anthony with violating 18 U.S.C. § 2423(a). The text of § 2423(a) provides: "A person who knowingly transports an individual who has not attained the age of 18 years . . . with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ." *Id*. The grand jury, however, did not allege that Anthony knowingly transported a minor with the intent that she engage in prostitution. Instead, the grand jury only alleged that he intended the minor to engage "*in any sexual activity* for which any person can be charged with a criminal offense." (DE 51:3) (emphasis added). The district court erred by instructing the jury that they could find Anthony guilty if the government proved that he intended the minor to engage in *prostitution*—the uncharged option. (DE 76:19).

58

The district court additionally erred by instructing the jury that the term "prostitution" means "engaging in or agreeing or offering to engage *in any lewd act* with or for another person in exchange for money or other consideration." (DE 76:19) (emphasis added). This formulation is significantly broader than the definition of prostitution and eased the government's burden of proof.

The district court's formulation in Count 4 is extremely odd because the court gave the correct definition for Count 2: "'Prostitution'" has the same meaning as the term 'commercial sex act,' that is it means *any sex act*, on account of which anything of value is given to or received by any person." (DE 76:15)(emphasis added). *See United States v. Cooper*, 926 F.3d 718, 738 (11th Cir. 2019) (the court defined " '[p]rostitution' [as] the performance of a 'commercial sex act . . . .' "). This difference undoubtedly sowed confusion in the jury room.

The district court exacerbated the problem by failing to define the term "lewd act" for the jury. Black's Law Dictionary defines a "lewd" act as "Obscene or indecent, tending to moral impurity or wantonness." pornographic, obscene, and lascivious" conduct." Black's Law Dictionary 1047 (10th ed. 2014). The term "lewd act" is, therefore, substantially

59

broader than the statutory term "sex act." *Cf.* 18 U.S.C. § 2246(2). Therefore, the district court's charge gave the jury a path to conviction that the grand jury did not charge and constructively amended the indictment.

Even if this Court concludes the district court did not constructively amend the indictment as asserted above, there is another issue. As previously noted, the grand jury charged Anthony with transporting Amber with the intent she would engage in "any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2423(a). Where, like here, "a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury." *United States v. Lopez*, 4 F.4th 706, 730 (9th Cir. 2021) (quoting *United States v. Davila-Nieves*, 670 F.3d 1, 8 (1st Cir. 2012)). While the court in *Lopez* considered a conviction under 18 U.S.C. § 2422(b), the same analysis applies here.

In *Lopez*, the evidence against the defendant implicated a sexual conduct offense in Guam. *Lopez*, 4 F.4th at 713, 724. The court held that while the district court was not required to instruct the jury on the elements of the particular predicate offense as if they were elements of

60

the offense charged, the district court nonetheless erred in failing to instruct the jury on the applicable criminal laws of Guam against which they were to evaluate the defendant's proposed sexual conduct. *Id.* at 729-31.

For the jury to determine whether Anthony intended to transport Amber to engage in "sexual activity for which any person can be charged with a criminal offense,"  18 U.S.C. § 2423(a), the district court had to explain to the jury what kind of "sexual activity" the government alleged and the relevant law. *See United States v. Dávila-Nieves*, 670 F.3d 1, 8 (1st Cir. 2012) (upholding the judge's decision to instruct the jury on the offense of sexual assault under Puerto Rico law in a prosecution under 18 U.S.C. § 2422(a), which prohibits enticing a minor to engage in "sexual activity for which any person can be charged with a criminal offense," because "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury" (quoting *United States v. Fazal-Ur-Raheman-Fazal*,     355     F.3d     40,     49     (1st     Cir.     2004))); *United States v. Rodríguez-Rodríguez*, 663 F.3d 53, 58 (1st Cir. 2011) (reasoning

61

that "[i]n order for the jury to determine" whether the defendant violated § 2422(b), "it had to be instructed on Puerto Rico law").

Indeed, every Circuit Court of Appeals, including ours, that has a pattern jury instruction for an offense using the phrase "sexually activity for which any person can be charged with a criminal offense" instructs the district court to insert the criminal offense or set out the elements of the applicable state or federal crime. *See, e.g.,* Eleventh Circuit Pattern Jury Instructions § O93.1; *see also* Fifth Circuit Criminal Jury Instructions § 2.91; Sixth Circuit Criminal Jury Instructions § 16.10; Seventh Circuit Criminal Jury Instructions for 18 U.S.C. § 2423(a); Eighth Circuit Model Jury Instructions § 6.18.2423(A).

In sum, the district court made three separate instructional errors in explaining Count 4 to the jury. First, the court instructed the jury that they could find Anthony guilty of an offense not charged in the indictment—that he transported Amber to engage in prostitution. Second, the court exacerbated this error by defining prostitution too broadly. Third, because the district court instructed the jury on an uncharged offense, he failed to set out the elements of the applicable state or federal crime required by the charged offense.

62

For the same reasons as discussed for Count 2, *supra*, at pp. 54-57, the district court committed plain error by constructively amending the indictment and providing a path to conviction that the grand jury did not charge in the indictment. This Court should vacate Anthony's conviction for Count 4.

## ISSUE IV

**THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE FOR COUNTS 2 AND 4 THAT ANTHONY INTENDED TO TRANSPORT A.V. OR AMBER FOR A PROSCRIBED PURPOSE.**

During A.V.'s testimony, the prosecutor *never* asked her if she understood that Anthony wanted her to travel to Miami to do sex work. And, as previously discussed, the government did not call Amber as a witness. The government did, however, present evidence about why Anthony wanted A.V. to go to Miami—to get a job dancing at a local strip club. Because this evidence negates the intent requirement for Counts 2 and 4, this Court must vacate Anthony's convictions.

In *Mortensen v. United States*, 322 U.S. 369, 374 (1944), the Supreme Court held that the defendant's intent to have those transported engage in *illegal* sexual activity must be formed *before* the transportation across state lines. Furthermore, the intent to engage in

63

the proscribed activities must be the motivating or dominant factor for the interstate travel. *Id.* at 374; s*ee also United States v. Wolf*, 787 F.2d 1094, 1097-1098 (7th Cir.1986) (holding that "[a]n incidental intention to engage in such activity at the conclusion of a journey is not enough to violate the Act; the immoral purpose must play a role in causing the woman to be transported rather than just be an opportunity created by transporting her entirely for other reasons . . . even if the opportunity was foreseen. "); *Forest v. United States,* 363 F.2d 348 (5th Cir.1966) (analyzing evidence to determine whether facts supported a finding that the intent or purpose to facilitate acts of prostitution was present in the defendant's mind *at or prior to the inception of the interstate transportation*); *Reamer v. United States*, 318 F.2d 43, 49 (8th Cir.1963) (noting the requisite intent must be found to exist *before the conclusion of the interstate journey* and must be a dominant motive of such interstate movement).

Therefore, both 18 U.S.C. § 2421(a) (Count 2/A.V.) and 18 U.S.C. § 2423(a) (Count 4/Amber) required the government to prove that Anthony intended to transport A.V. and Amber for the dominant purpose of engaging  in prostitution or proscribed sexual activity. Furthermore, the

government had to prove that Anthony had this intent before the interstate transportation.

In this case, the government offered no testimony or other evidence that Anthony—before crossing from Georgia to Florida—intended that A.V. or Amber engage in prostitution as any purpose of the trip, let alone a dominant one. The evidence showed that because Atlanta was "slow," Anthony told A.V. and Amber they were going to Miami "around" the Super Bowl. (DE 182:19-20). A.V. testified that Anthony told her he wanted her to strip at a club in Miami. (DE 182:20). And A.V. wanted to work in a strip club in Miami, hoping she could make money. (DE 182:55-56; DE 183:163-165; GX 57). As discussed above, Amber did not testify.

The evidence also showed that on January 20, 2020, before they traveled, Anthony reached out to a contact at a club in Miami to see if they would hire A.V. to dance. (DE 183:163-164; GX 57). Specifically, he wanted to know whether she could be hired and dance the same day. (DE 183:165 GX 57). Anthony sent his contact a picture of A.V. and asked, "You think they would hire her?" (DE 183:165 GX 57). His contact answered, "Yes." Anthony responded, "For sure? Because I'm basically coming out there just to get her hired." (DE 183:165; GX 57).

To convict Anthony for Counts 2 and 4, the jury had to find beyond a reasonable doubt that before crossing state lines, he knowingly transported A.V. and Amber for the purpose of engaging in prostitution or proscribed sexual activity. While the government did establish that Anthony transported A.V. to Florida for the purpose of her dancing in a strip club, the evidence did not demonstrate the intent required under §§ 2141 and 2143 for Counts 2 and 4. This Court should reverse his convictions.

## CONCLUSION

For the preceding reasons, this Court should vacate Anthony Carter's convictions.

Respectfully submitted,

HECTOR A. DOPICO
Interim Federal Public Defender

*/s/ Michael Caruso*
MICHAEL CARUSO
Assistant Federal Public Defender
Attorney for Appellant
150 West Flagler Street, Suite 1700
Miami, Florida 33130
(305) 533-4200

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,770 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

*/s/ Michael Caruso*
MICHAEL CARUSO

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 27th day of June 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent four copies to the Clerk of the Court via third-party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/ Michael Caruso*
MICHAEL CARUSO